AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

SEP **2 5** 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

(1) One Samsung Cellphone, MODEL: SM-J737P
IMEI: 354255096218468, FCC ID: A3LSMJ737P

)
)
)
)
)

Case No.  '19 MJ 4154

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1028(a)(2), (f) | Transferring False Identification Documents, and Conspiracy to do the same |

The application is based on these facts:

See attached Affidavit of Special Agent Roberto Rospigliosi.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Roberto Rospigliosi, Special Agent HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____9/25/2019____

_____
*Judge's signature*

City and state:  San Diego, CA

Hon. F.A. Gossett, United States Magistrate Judge
*Printed name and title*

FILED

SEP 2 5 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA '19 MJ4 1 5 4

| IN THE MATTER OF THE SEARCH OF | **AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT** |
|---|---|
| (1) One Samsung Cellphone MODEL: SM-J737P IMEI: 354255096218468 FCC ID: A3LSMJ737P | |

I, Roberto Rospigliosi, Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), having been duly sworn, hereby state as follows:

## INTRODUCTION

1.     I make this affidavit in support of an application for a warrant to search the following electronic device:

> (1) One Samsung Cellphone
> MODEL: SM-J737P
> IMEI: 354255096218468
> FCC ID: A3LSMJ737P
> (**Target Device**)

and seize evidence of crimes, specifically, violations of Title 18, U.S.C., Sec. 1028(f) - Conspiracy to Transfer False Identification Documents; and Title 18, U.S.C., Sec. 1028(a)(2) - Transferring False Identification Documents (the Target Offenses). This search supports an investigation and prosecution of Maria Del Pilar Peralta ESQUIVEL, aka Maria Del Pilar Esquivel-Gonzalez (ESQUIVEL) for one or more of the crimes mentioned above.

2.     The **Target Device** was seized on September 5, 2019, at 4129 University Avenue, San Diego, CA. The **Target Device** was seized from

1

ESQUIVEL pursuant to her arrest for conspiracy to transfer false identification documents. The **Target Device** is currently stored as evidence at the HSI evidence vault at 2297 Niels Bohr Court, San Diego, CA 92154.

3.      Based on the information below, there is probable cause to believe that a search of the **Target Device**, as described in Attachment A, will produce evidence of the aforementioned crimes, as described in Attachment B.

4.      The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

### EXPERIENCE AND TRAINING

5.      I have been employed as a Special Agent with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) since November 2010. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge, in San Ysidro, California. I graduated from the Criminal Investigator Training Program and Homeland Security Investigations Special Agent Training at the Federal Law Enforcement Training Center (FLETC) in April 2011. I am currently assigned to the Document and Benefit Fraud Task Force, where my duties include investigating fraudulent applications for immigration benefits, the manufacture and sale of fraudulent immigration documents, and financial exploitation of immigrants.

6.      I am a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule

2

41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

7.     Throughout my career, I have been involved in dozens of criminal investigations for multiple violations of federal and state laws including, but not limited to immigration fraud, alien smuggling, narcotics smuggling, weapons trafficking, money laundering and organized criminal activity. I have participated in many aspects of criminal investigations including reviewing evidence, conducting physical surveillance, working with informants, and the execution of arrest and search warrants.

8.     My training and experience in immigration enforcement has included the identification of fraudulent documents, methods used to manufacture and distribute fraudulent documents, and the investigation of persons involved in trafficking in such documents. In addition, I speak regularly with other investigators regarding the manner in which sellers of fraudulent documents operate.

9.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for individuals involved in the selling of fraudulent documents to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. Typically, the individual selling the fraudulent documents will obtain photographs, names, and/or dates of birth from individuals needing fraudulent documents and will use their cellular telephones to forward the pictures and biographic information to the manufacturer. Once the documents are ready, the individual will remain in telephonic contact with co-conspirators to coordinate the delivery, pick up and/or sale of the fraudulent documents.

10.     Based upon my training and experience as an HSI Special Agent, my participation in the investigation of individuals involved in manufacturing and transfer of fraudulent documents, and consultations with law enforcement officers experienced with document fraud investigations, and all the facts and opinions set forth in this Affidavit, I submit the following:

    a.     Fraudulent document vendors and their accomplices will use cellular/mobile telephones because they are mobile, and they have instant access to telephone calls, text, web, and voice messages.

    b.     Fraudulent document vendors and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time fraudulent documents will be ready.

    c.     Fraudulent document vendors and their accomplices will use cellular/mobile telephones to direct their customers for an exact drop off and/or pick up time of their fraudulent documents.

    d.     Fraudulent document vendors will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units.

    e.     The use of cellular/mobile telephones by fraudulent document vendors and their accomplices tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

11.     Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages.

4

Much of the evidence generated by a fraudulent document vendor use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in fraudulent document investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned, based upon my training, education, and experience that searches of cellular/mobile telephones associated with fraudulent document investigations yield evidence:

a. tending to identify attempts to manufacture, sell, or transfer false identification documents;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the manufacture, sale, or transfer of false identification documents;

c. tending to identify co-conspirators, criminal associates, or others involved in the manufacture, sale, or transfer of false identification documents;

d. tending to identify travel to or presence at locations involved in the manufacture, sale, or transfer of fraudulent identification documents, such as false document mills or delivery points;

5

e.     tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## **STATEMENT OF PROBABLE CAUSE**

### A.     **Introduction/Background**

13.     On December 21, 2018, HSI, San Diego Document and Benefit Fraud Task Force (DBFTF) Special Agents received information from a Source of Information (SOI)[1] regarding the activities of Pilar, an individual believed to be selling fraudulent identification documents. According to the SOI, in December 2018, the SOI gave a friend a ride to the corner of University Avenue and Marlborough Avenue in San Diego, California. The SOI said a friend told him/her that he was picking up a set of fraudulent immigration documents that he was buying from Pilar. The SOI's friend told him/her that Pilar also sells tamales at a food cart. The SOI waited in the car when his/her friend approached Pilar at the food cart. When the SOI's friend returned, he showed the SOI a fraudulent Permanent Resident card and a fraudulent Social Security card that were made for him. The SOI's friend identified Pilar's phone number as (619) 751-8472 (**Target Device**) and stated Pilar sells a set of fraudulent documents for $100 and are made within 24 hours after receiving a name and a photograph.

14.     Agents conducted surveillance at the intersection of University Avenue and Marlborough Avenue. Agents observed a Hispanic female selling tamales at a

---

[1] SOI has no prior criminal convictions. He/she is cooperating in exchange for immigration benefits, specifically authorization to live and work in the United States.

6

food cart with the name "TAMALES OAXAQUENOS" written on the front near the intersection.

15.     Agents ran an open source database query of phone number (619) 751-8472. Open source queries showed the number is serviced by Sprint PCS and subscribed to Maria ESQUIVEL at 4059 Chamoune Avenue, San Diego, CA 92105. Agents ran an open source database query of 4059 Chamoune Avenue, San Diego, CA 92105.   Open source databases indicate the address is associated to Pilar Esquivel, later identified in U.S. Department of Homeland Security databases as Maria del Pilar Peralta ESQUIVEL.

**B.     First Controlled Purchase of Fraudulent Documents**

16.     On January 22, 2019, at the direction of agents, the SOI initiated contact with ESQUIVEL via text message to the **Target Device**. The SOI told ESQUIVEL his/her friend gave him/her ESQUIVEL's phone number and asked if she could sell him/her two Permanent Resident and Social Security cards (collectively referred to as ID cards). ESQUIVEL told the SOI she would be able to sell him/her ID cards and to stop by her food cart.

17.     Prior to the meeting with ESQUIVEL, the SOI met with agents, who provided the SOI with $200.00 and two photographs, one of a Hispanic male and one of a Hispanic female with fake names and date of births written on the back of the photographs – Juan Lopez 08/13/88 and Raquel Torres, DOB 06/11/83.[1] Agents then established surveillance near 4129 University Avenue, to monitor the meeting between the SOI and ESQUIVEL. The SOI wore a recording/transmitting device.

18.     At approximately 5:00 p.m., agents observed the SOI hand ESQUIVEL the photographs to be used to make the ID cards and cash. During this meeting, the

---

[1] Agents used photos from random, old A-files and made up names and DOBs. Agents searched the SOI before and after each meeting with ESQUIVEL.

SOI asked when the documents would be ready, and ESQUIVEL stated they would be ready the next day. ESQUIVEL told the SOI to give her the other $100.00 when he/she picked up the ID cards. Agents maintained surveillance of ESQUIVEL until approximately 9:00 p.m. During that time, she closed the food cart, and went home to 4059 Chamoune Avenue, San Diego, CA.

19.    On January 23, 2019, at approximately 6:00 a.m., agents established surveillance of ESQUIVEL at the food cart. At 8:30 a.m., the SOI initiated a conversation with ESQUIVEL:

| | |
|---|---|
| SOI: | Good morning Pili. Can you please do me a favor and let me know when they are ready, so I can pick them up, thanks. |
| ESQUIVEL: | Yes, I will let you know ok, thanks.[1] |

20.    At approximately 12:44 p.m., ESQUIVEL texted the SOI, "Come by." The SOI texted back, "I will go once I get off work. I will come with the rest of the money, thanks." ESQUIVEL replied, "Ok."

21.    At approximately 2:00 p.m., the SOI met agents, who provided him/her with $100.00 and a recording/transmitting device. Agents then established surveillance.

22.    At approximately 2:15 p.m., agents saw the SOI walk towards the food cart and meet ESQUIVEL. Agents saw the SOI give ESQUIVEL the other $100.00 and saw ESQUIVEL give the SOI a white bag. After the transaction, the SOI left the area. The SOI then texted ESQUIVEL to thank her, and ESQUIVEL responded, "Ok you are welcome."

23.    At approximately 2:45 p.m., agents met with the SOI. The SOI gave agents the white bag that contained two more white bags and inside those bags, were

---

[1] The text messages referenced in this affidavit were preserved. All the text messages exchanged between the SOI and ESQUIVEL were in Spanish and translated to English by me. I am fluent in Spanish.

8

two envelopes. One envelope had "China" and "Raquel" written on it. The other envelope had "China" and "Juan" written on it. Agents opened the envelopes and discovered several documents. The documents for "Raquel Torres" included a Permanent Resident card bearing an invalid A-Number and a Social Security card bearing a valid Social Security number. The documents for "Juan Lopez" included a Permanent Resident card bearing an invalid A-Number and a Social Security card bearing a valid Social Security number.

## C.    **Second Controlled Purchase of Fraudulent Documents**

24.    On March 6, 2019, the SOI communicated with ESQUIVEL to purchase additional documents. At approximately 7:51 a.m., the SOI sent ESQUIVEL a text message to the **Target Device,** asking "Can I take you two in the afternoon." ESQUIVEL responded, "ok."

25.    At approximately 5:00 p.m., the SOI met with agents, who provided him/her with $200.00 and two photographs of Hispanic males with fake names and DOBs written on the back of the photographs – Fabian Hernandez, DOB 08/16/83, and Arturo Tirado, DOB 06/11/78. Agents then established surveillance near 4129 University Avenue. The SOI wore a recording/transmitting device.

26.    At approximately 5:55 p.m., the SOI sent ESQUIVEL a text message to the **Target Device**:

| | |
|---|---|
| SOI: | I will be there in 3 minutes please. |
| ESQUIVEL: | Wait for me in the laundromat. |
| SOI: | Ok, I am here. |
| ESQUIVEL: | I am coming. |

27.    Agents then saw the SOI meet ESQUIVEL in front of a laundromat that is in the same parking lot as the food cart. Agents saw the SOI give ESQUIVEL the photographs and money. Agent listened to the recorded conversation and heard ESQUIVEL ask the SOI, "Do you have everything?" The SOI responded,

"everything is there." ESQUIVEL then said, "I'm going to give him the stuff now. He wakes up around 10 in the morning. I will send you a message tomorrow."

28.    After the meeting, agents observed the SOI leave the area and ESQUIVEL walked back to the food cart.

29.    The SOI met with agents and informed them that ESQUIVEL said she was going to call the guy and that the ID cards would be ready the next day. The SOI told agents ESQUIVEL only asked for half of the money ($100.00) because the other half ($100.00) would be given to her when the SOI picked up the ID cards. The SOI returned $100.00 to the agents.

30.    On March 7, 2019, at approximately 8:00 a.m., agents established surveillance of ESQUIVEL at the food cart. At approximately 11:14 a.m., the SOI sent ESQUIVEL a text message to the **Target Device**:

| | |
|---|---|
| SOI: | Good morning pili it is slow at my work. I will be leaving early in case they are ready. Please let me know |
| ESQUIVEL: | I will let you know, they did not bring them yet |
| SOI: | Ok let me know, thanks |

31.    At approximately 11:30 a.m., agents saw ESQUIVEL leave the food cart with money in her hand and saw her go towards the laundromat where she met a Hispanic male in a wheelchair, later identified as Luis Fernando GOMEZ-Herrera. Agents saw ESQUIVEL and GOMEZ return to the food cart. Once near the food cart, GOMEZ left the area.

32.    Approximately fifteen minutes later, ESQUIVEL texted the SOI from the **Target Device**, "You can come by now because I am leaving at 5." The SOI texted back that he would be there as soon as possible. ESQUIVEL replied, "Ok."

33.    At approximately 2:00 p.m., the SOI met with agents, who provided the SOI with $100.00 and a recording/transmitting device.

10

34.     At approximately 2:20 p.m., agents saw the SOI walk towards the food cart and meet with ESQUIVEL. Agents saw the SOI give ESQUIVEL the $100.00 and saw ESQUIVEL give the SOI a black plastic bag. At the end of the meeting, ESQUIVEL told the SOI to text her if he/she needs anything else. The SOI then left the area and ESQUIVEL stayed at the food cart.

35.     Ten minutes later, agents met the SOI. The SOI gave agents a black plastic bag that contained two envelopes. Both envelopes had "China"[1] written on them. Inside the envelopes were documents for "Arturo Tirado" and "Fabian Hernandez," including Permanent Resident cards with valid A-Numbers and Social Security cards with valid Social Security numbers. Agents checked the A-Numbers and Social Security numbers and confirmed that the numbers were again valid but not assigned to either Arturo Tirado or Fabian Hernandez.

**D.     Third Controlled Purchase of Fraudulent Documents**

36.     On April 8, 2019, the SOI began communicating with ESQUIVEL to purchase a third set of documents. At approximately 7:58 a.m., the SOI sent ESQUIVEL a text message to the **Target Device**:

| | |
|---|---|
| SOI: | Good morning boss Pili. I will take you some today. Can you please see if you can get them to me as soon as possible? |
| ESQUIVEL: | Ok, what time are you coming? |
| SOI: | I will get there around 5. Is that ok? |
| ESQUIVEL: | Ok |

37.     At approximately 5:00 p.m., the SOI met with agents. During the meeting, agents gave the SOI $200.00 and two photographs with fake names and DOBs written on the back, e.g., Angel Contreras DOB 02/22/81, and Ramon

---

[1] The handwriting on the envelopes from January 23, 2019 and March 7, 2019 appear to be identical.

Delgado DOB 3/11/77. Agents gave the SOI a digital recorder/transmitter, and established surveillance near 4129 University Avenue.

38.     At approximately 5:27 p.m., agents observed the SOI meet with ESQUIVEL in front of the food cart. Agents saw the SOI give ESQUIVEL the photographs and the $200.00. A few minutes later, SOI left the area and ESQUIVEL stayed at the food cart.

39.     At approximately 5:45 p.m., agents saw ESQUIVEL walk towards the laundromat that is in the same parking lot as the food cart. ESQUIVEL met with GOMEZ and it appears she gave him the photographs. After this, ESQUIVEL went back to the food cart and GOMEZ left the parking lot. Agents followed GOMEZ on foot and saw him enter 3829 Marlborough Avenue, Apt. 5, San Diego, CA 92105.

40.     On April 9, 2019, the SOI texted ESQUIVEL to determine whether the documents were ready.

41.     At approximately 11:35 a.m., agents saw GOMEZ exit the apartment and meet ESQUIVEL in the laundromat. ESQUIVEL then walked back to the food cart and GOMEZ returned to the apartment.

42.     At approximately 12:48 p.m., ESQUIVEL sent the SOI a text message from the **Target Device**:

| | |
|---|---|
| ESQUIVEL: | Where are you. Are you coming? |
| SOI: | I am at work. Yes, I will be there in about an hour and a half. Are they ready? |
| ESQUIVEL: | Yes, ok. |
| SOI: | Why did you not send me a message to let me know they were ready? |
| ESQUIVEL: | Just got them. |

43.     At approximately 2:00 p.m., the SOI met with agents, who provided SOI with a recording/transmitting device. Agents then maintained surveillance.

12

44.     At approximately 2:20 p.m., agents saw the SOI walk to the food cart and meet with ESQUIVEL. Agents saw ESQUIVEL give the SOI a white plastic bag. After the transaction, the SOI left the area and ESQUIVEL stayed at the food cart.

45.     At approximately 2:30 p.m., agents met with the SOI. The SOI gave agents a white plastic bag that contained two envelopes. Inside the envelopes were the ID cards. The documents for "Angel Contreras" included a Permanent Resident card bearing an invalid A-Number and a Social Security card bearing a valid Social Security number. The documents for "Ramon Delgado" included a Permanent Resident card bearing an invalid A-Number and a Social Security card bearing a valid Social Security number. Agents checked the A-Numbers and Social Security numbers and confirmed that the numbers were again valid but not assigned to either Angel Contreras or Ramon Delgado.

**E.      Fourth Controlled Purchase of Fraudulent Documents**

46.     On July 30, 2019, the SOI began communicating with ESQUIVEL to purchase a fourth set of documents. At approximately 11:57 a.m., the SOI sent ESQUIVEL a text message to the **Target Device**:

> SOI:            Good morning Pili. I have one, can I take it to you, thanks.
> ESQUIVEL:    Ok, that is fine

47.     On August 8, 2019, at approximately 9:28 a.m., the SOI continued a conversation with ESQUIVEL:

> SOI:            Good morning boss pili, I will take them to you today at 5 please. They did not have the money but today I already have them.
> ESQUIVEL:    ok thanks

48.     At approximately 4:30 p.m., the SOI met with agents. During the meeting, agents gave the SOI $200.00 and two photographs with fake names and

13

1   DOBs written on the back, e.g., Antonio Guzman DOB 7/13/1979, and Miguel
2   Torres DOB 3/11/1985. Agents gave the SOI a digital recorder/transmitter, and
3   established surveillance near ESQUIVEL's food cart at 4129 University Avenue.

4   49.   At approximately 4:48 p.m., the SOI sent ESQUIVEL a text message
5   to the **Target Device**:

6   SOI:           Pili I am on my way
    ESQUIVEL:      Give them to me discreetly because there is a lady
7                  here. Please say to me this is what I owe you
8   SOI:           Ok that is fine

9   50.   At approximately 5:10 p.m., agents observed the SOI meet with
10  ESQUIVEL in front of the food cart. Agents saw the SOI give ESQUIVEL the
11  photographs and the $200.00. During the meeting, the SOI told ESQUIVEL, "Here
12  is what I owe you." ESQUIVEL responded, "See you later." Minutes later, the SOI
13  left the area and ESQUIVEL stayed at the food cart.

14  51.   On August 9, 2019, at approximately 10:32 a.m., the SOI sent
15  ESQUIVEL a text message to the **Target Device**:

16  SOI:           Pili, please tell me when they are ready, so I can
17                 go pick them up. As you can see I am a little
                   backed up. I will take my break in a while and I
18                 can go get them, thanks.
19  ESQUIVEL:      Yes, yesterday I was busy. I will text you when
                   they are ready. I will let you know. It will be
20                 today.
21  SOI:           Ok thanks

22  52.   At approximately 12:30 p.m., agents saw GOMEZ exit the apartment.
23  He walked to the laundromat where he met ESQUIVEL. Agents saw ESQUIVEL
24  give GOMEZ a white plastic bag. GOMEZ went back to the apartment and
25  ESQUIVEL went back to the food cart.

26  53.   At approximately 1:18 p.m., agents saw GOMEZ exit the apartment
27  and meet ESQUIVEL in the laundromat. Agents saw GOMEZ give ESQUIVEL a

14

white plastic bag. ESQUIVEL then walked back to the food cart and GOMEZ returned to the apartment.

54.    At approximately 1:28 p.m., ESQUIVEL sent the SOI a text message from the **Target Device**:

ESQUIVEL:    Done but you have to buy a tamale ok?
SOI:         Ok
             . . .
ESQUIVEL:    At what time will you be here?
SOI:         In 45 minutes maximum
ESQUIVEL:    Ok

55.    At approximately 2:30 p.m., the SOI met with agents, who provided SOI with a recording/transmitting device. Agents then maintained surveillance.

56.    At approximately 2:45 p.m., agents saw the SOI walk to the food cart and meet with ESQUIVEL. Agents saw ESQUIVEL give the SOI a white plastic bag. After the transaction, the SOI left the area and ESQUIVEL stayed at the food cart.

57.    At approximately 2:50 p.m., agents met with the SOI. The SOI gave agents the white plastic bag that contained two envelopes. One envelope had "Antonio" written on it and the other envelope had "Miguel" written on it.[1] Inside the envelopes were the ID cards and the pictures that were originally provided to ESQUIVEL by the SOI. The documents for "Antonio Guzman" included a Permanent Resident card bearing an invalid A-Number and a Social Security card bearing a valid Social Security number. The documents for "Miguel Torres" included a Permanent Resident card bearing an invalid A-Number and a Social Security card bearing a valid Social Security number. Agents checked the A-

---

[1] The handwriting on the envelopes from January 23, 2019, March 7, 2019, and August 8, 2019 appear to be identical.

15

Numbers and Social Security numbers and confirmed that the numbers were again valid but not assigned to either Antonio Guzman or Miguel Torres.

**F.     Fifth Controlled Purchase of Fraudulent Documents**

58.     On September 3, 2019 the SOI texted with ESQUIVEL to purchase a fifth set of documents. At approximately 3:06 p.m., the SOI texted ESQUIVEL to the **Target Device**, "Pili, can I take you 2 for the same day on Thursday. They are for my cousins that need green cards to work. It's urgent but they get here tomorrow at night." ESQUIVEL answered, "ok it is fine."

59.     On September 5, 2019 at approximately 8:30 a.m., the agents gave the SOI $200.00 and two photographs with fake names and DOBs written on the back, e.g., Cesar Mendoza Ayala 11/6/1984, and Ramon Delgado Orozco 3/21/1982.

60.     At approximately 8:37 a.m., the SOI sent ESQUIVEL a text message to the **Target Device**:

> SOI:            Pili I am on my way
> ESQUIVEL:       Here discreetly please because I have people here. Please say to me this is what I owe you
> SOI:            Ok that is fine

61.     At approximately 9:00 a.m., agents saw the SOI give ESQUIVEL the photographs and cash.

62.     At approximately 12:04 p.m., agents saw GOMEZ exit the apartment on Marlborough Avenue and meet ESQUIVEL. Agents saw ESQUIVEL give GOMEZ a white plastic bag. GOMEZ returned to the apartment, and ESQUIVEL went back to the food cart.

63.     At approximately 1:30 p.m., agents again saw GOMEZ meet ESQUIVEL. During this meeting, agents saw GOMEZ give ESQUIVEL a white plastic bag. At that point, agents arrested ESQUIVEL and GOMEZ for violation of Title 18 U.S.C. § 1028(f) – Conspiracy to Transfer False Identification Documents.

During a pat down of ESQUIVEL, agents found the counterfeit Permanent Resident cards and counterfeit Social Security cards for Cesar Mendoza Ayala and Ramon Delgado and $525.32 and the **Target Device**. During a biographical interview of ESQUIVEL, she stated the Target Device belonged to her.

64.    During a pat down of GOMEZ, agents found eight (8) counterfeit Social Security Cards, six (6) counterfeit Permanent Resident cards, and $922.00. Pursuant to a federal search warrant, agents searched GOMEZ' residence, 3829 Marlborough Avenue Apt 5, San Diego, CA 92105. A search of the apartment resulted in the seizure of $13,800, two (2) scanner/printers, three (3) computers, one (1) counterfeit Permanent Resident card and one (1) counterfeit Social Security card.

## G.    Conclusion

65.    Based on my training and experience, and consultation with law enforcement agents who have training and experience investigating counterfeit immigration documents, I believe that ESQUIVEL coordinates the sale of counterfeit ID cards by using the **Target Device**. I also believe that ESQUIVEL agreed with known and unknown co-conspirators to coordinate the manufacture, sale, and transfer of counterfeit immigration documents to individuals without immigration status contrary to law in the United States. I further believe that ESQUIVEL sells counterfeit ID cards for monetary compensation.

66.    As noted above, the investigation revealed that on at least five occasions, ESQUIVEL used the **Target Device** to coordinate the delivery of photographs with biographical information with the SOI and also used the **Target Device** to coordinate the transfer of counterfeit ID cards with the SOI. Therefore, I submit there is probable cause to believe that the **Target Device** contains evidence of crimes related to the manufacture, sale, and transfer of counterfeit identification documents. Based on all of the facts, I believe that the date range for this search should be from December 1, 2018, through September 5, 2019.

17

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION FOR CELLULAR TELEPHONE

67.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

68.     Following the issuance of this warrant, agents will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephone and memory card(s) will employ search protocols directed

18

exclusively to the identification and extraction of data within the scope of this warrant.

69.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## **CONCLUSION**

70.     Based on all of the facts and circumstances described above, there is probable cause to conclude that ESQUIVEL used the **Target Device** to facilitate violations of Title 18, U.S.C., Sec. 1028(f) - Conspiracy to Transfer False Identification Documents; and Title 18, U.S.C., Sec. 1028(a)(2) - Transferring False Identification Documents.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

71.    Because the **Target Device** was promptly seized during the investigation of ESQUIVEL's sale of fraudulent identification documents and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by ESQUIVEL continues to exist on the **Target Device**. As stated above, I believe that the date range for this search is from December 1, 2018 through September 5, 2019.

72.    WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Roberto Rospigliosi
HSI Special Agent

Subscribed and sworn to before me this _____ 2 5 day of September, 2019.

HON. F.A. GOSSETT
United States Magistrate Judge